Affirmed.

26 C.C.P.A.(Patents)

### LEICHSENRING v. FREEMAN.

#### Patent Appeal No. 4109.

Court of Customs and Patent Appeals.

May 1, 1939.

Parker, Carlson, Pitzner & Hubbard, of Chicago, Ill. (W. M. Alexander, of Chicago, Ill., George E. Tew, of Washington, D. C., and C. Paul Parker, of Chicago, Ill., of counsel), for appellant.

E. E. Huffman and P. H. Lamphere, both of St. Louis, Mo., for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office reversing the decision of the Examiner of Interferences in an interference proceeding involving a device designed to be associated with the brake applying system of an automotive vehicle to prevent unintended retrograde movement, or rolling backwards, of the vehicle. Its especial usefulness appears to be in situations where it becomes necessary to stop and then start the vehicle on an upgrade, but the counts do not so limit it. Such devices are frequently referred to in the record as "no roll-back" devices. The brief on behalf of appellant says: " 'No roll-back' devices are primarily used when the driver of a vehicle finds it necessary to do three things with only two feet: In other words, to (1) step on the clutch pedal to disengage the clutch, (2) step on the brake pedal to hold the car against coasting, and (3) step on the accelerator."

The device of the issue, by bringing about coordination between the release of the clutch and the application of the foot brake, combines the first two of the foregoing acts, placing them for a time under the control of the clutch mechanism.

The interference embraces seven counts of which all except count 1 are limited to the application of the device to fluid actuated brake systems. Counts 1 and 2 read:

"1. The combination with the brake and clutch mechanisms of a vehicle, of means connected for actuation by the clutch mechanism for holding the brakes applied after the operator has set the brakes, and means for limiting the maximum force with which the brakes may be held by said clutch mechanism.

"2. In a motor vehicle having a fluid actuated braking system and disengageable power transmission mechanism, the combination of means for applying the brakes, control means for said first mentioned means connected with said mechanism for maintaining the brakes in applied condition while said mechanism is disengaged, and means for determining the maximum force under which said brakes may be maintained in applied condition."

In view of the issue of the case no further description than that already given is essential.

 Freeman is the senior party, his application having been filed February 15, 1933; that of Leichsenring, Jr., was filed August 23, 1933. Freeman took no testimony and concededly is restricted to his filing date for conception and reduction to practice. Leichsenring in his preliminary statement claimed conception on or about June 10, 1932, and reduction to practice on or about July 15, 1932. As the junior party it was incumbent upon appellant to establish his case by a preponderance of the evidence.

It is not questioned that Leichsenring embodied the invention in a device which responds to the counts and tested same in the summer of 1932, but the claim of appellee is that the tests made did not constitute a reduction to practice and that appellant failed to establish diligence during the critical period from just prior to appellee's filing date until his (appellant's) own filing date.

The Examiner of Interferences reviewed the testimony offered on appellant's behalf in extenso and concluded that tests made in August, 1932, did constitute reduction to practice at that time and awarded priority to him. Upon appeal the board took the view that the tests then made did not demonstrate the device to be success-

ful and that there was no showing of diligence during the critical period. Hence, it reversed the examiner's decision.

The device which appellant made and tested is in evidence as Leichsenring's Exhibit 2.

The principal controversy grows out of the fact, which was admitted, that during the tests there was a certain leakage of brake fluid around what the Examiner of Interferences describes as "the swing cock of Exhibit 2." It is contended that as a result of this leakage the brakes were released and did not hold the vehicle for a sufficient time to prove success.

It appears from the record that the purpose of the swing cock valve was to trap fluid in the system. Leichsenring testified that he found the brass piece from which he fashioned the body of Exhibit 2, and also the cock valve that he used, which is conventional in type, in a heap of discarded scrap at a plant in which he was employed. Evidently the swing cock did not thoroughly seal the opening and there was some leakage at the bearing of it.

It is urged by appellant that it is immaterial, so far as demonstrating the success of the invention is concerned, that the leakage occurred; that the function of the swing cock was well known; that it had "only incidental bearing upon the operativeness of the essence of the invention here in issue, namely, the maximum pressure limiting means," and that leakage in the valve did not destroy the operativeness of the device but was a fault readily overcomable without the exercise of inventive ingenuity.

Since, from our viewpoint, the only question of importance here is the matter of reduction to practice there is no necessity for a general review of all the evidence. In addition to his own testimony appellant introduced the testimony of three persons who witnessed, in fact participated in, the tests. These were John J. Krez, the president and treasurer of a company whose business was not shown; Otto Spevak, connected with a Ford motor sales company, and Harry Jacobsen, a civil engineer. So far as appears, no one of these persons had any financial interest in the outcome of the case.

The witnesses Krez and Jacobsen seem to have aided appellant in procuring the loan of a Plymouth car upon which the device was installed for making the tests

and they accompanied him when some demonstrations were made. One of these demonstrations took place on a hill on Lake Shore Drive, in or near the city of Chicago, Illinois, and Krez drove the car during a part of that demonstration. He testified as follows:

"I drove the car and started and stopped it several times. The device functioned, to my mind, very good, with the exception that it, after it had stopped for a while, it seemed to slide back just a little bit. So Leichsenring would get out and raise the hood and make some adjustment on a lever, at which time the car would hold, and he said that he had some more work to do on a valve which was not sealing properly, and an adjustment on a lever before it would be perfect.

"Q. 14. Did you drive the car and stop and start it on the hill, yourself? A. Yes, I did; many times.

"Q. 15. When there was no interval between the stopping and the starting of the car, or only a short interval, did the device operate perfectly? A. Yes, it did.

"Q. 16. State whether, when the brake was applied while going up the hill, the car would be held for a brief interval, enabling you to start it again by throwing in the clutch and stepping on the gas. A. Oh, yes, certainly the car held. It was only after an interim of possibly, it would seem to me, a minute or so, that there would be—you would notice a slight sliding back, but the car held stationary."

Krez was not cross-examined.

Another test was made on a ramp at Spevak's place of business where Spevak drove the car. From his testimony we quote the following:

"A. Well, the first time we tried it, why, the car seemed to come back down the incline a little bit, and then Mr. Leichsenring got underneath the car and adjusted something in there, and tried it the second time, and it held good.

"Q. 13. Did you try it more than one time? A. Oh, we tried it several times.

"Q. 14. And it held the car on the hill after the brake was—A. Well, you had to have the clutch pedal depressed, but your brake was released. As long as you kept your clutch pedal in, the car stood still.

"Q. 15. When he depressed the clutch pedal and stepped on the gas, the car moved forward? A. After he left the clutch pedal off and stepped on the gas, the car proceeded to climb up the hill."

The following is from Spevak's cross-examination:

"X-Q. 6. How long did you hold the car still on the incline? A. Oh, I would say, maybe fifteen or twenty seconds."

The witness Jacobsen helped install the device on the Plymouth car, and accompanied appellant at the demonstrations which have been recited. Referring to the demonstration in which Spevak drove the car Jacobsen testified that the ramp was very steep and the car did not hold until Leichsenring tightened up an adjustment on a valve "which would retain a higher pressure in the system, and from then on, the car held very nicely on that ramp."

This witness was cross-examined at considerable length. From this cross-examination we quote the following:

"X-Q. 39. You testified that when you were making the demonstration at Mr. Spevak's garage, that the car was not held stationary on the ramp by the device, and that Mr. Leichsenring made some adjustment. Did you see him make the adjustment? A. Yes.

"X-Q. 40. And what did he adjust? A. He adjusted a valve in that device, in Exhibit 2, which controls the amount of pressure contained in the brakes, after they have been set. In other words, he made a tighter adjustment on a valve so the brakes would hold on a steeper slope.

"X-Q. 41. What tool did he use for that purpose? A. I don't remember what tool he used for that purpose.

"X-Q. 42. Did he turn any particular nuts or plugs on this Leichsenring's Exhibit 2? A. Yes.

"X-Q. 43. Which one? A. He took this one out.

"X-Q. 44. You are referring now to the plug nearest the inlet fitting? A. That is right.

"X-Q. 45. And you say he took that plug out? A. Yes.

"X-Q. 46. Did any fluid run out of the system when he took it out? A. Yes, he lost some fluid.

"X-Q. 47. What else did he do besides taking the plug out? A. He tightened the spring, that is, he took the spring out, took the parts off, and he put it back in place.

"X–Q. 48. Well, did he do anything with the parts when he took them out? A. Yes, he pulled the spring apart to elongate the spring more, so when it compressed it would have a little more pressure behind it.

\* \* \* \* \* \*

"X–Q. 65. During the demonstrations of this Plymouth car did you find it necessary to add any brake fluid to the braking system on the car? A. Yes.

"X–Q. 66. Why was that? A. Because we detected leakage. There was leakage in that cock valve.

"X–Q. 67. How much brake fluid did you have to purchase or use? A. We purchased—I don't know the contents of the cans. We bought one can, a small can.

"X–Q. 68. You used it all? A. No, we did not use it all.

"X–Q. 69. How many times did you add fluid to the master cylinder? A. I do not remember how many times.

"X–Q. 70. More than once, though? A. More than once, yes.

"X–Q. 71. There was rather a substantial leak occurred every time you put on the brakes? A. No, not necessarily.

"X–Q. 72. Well, what is the fact? Did it leak when you put the brakes on, or didn't it? A. It leaked when the brakes were held applied. You could put the brakes on and take them off again, and it would not leak.

"X–Q. 73. But it leaked while the brakes were held applied? A. Yes.

"X–Q. 74. Then, if you took your foot off the brake pedal, the brakes would not hold applied, even if you held the clutch pedal down? A. Yes, it would.

"X–Q. 75. How long? A. I never timed it. Never put a stop-watch on it or anything, but it held and gave a—well, it performed what it was supposed to perform to hold the car on a grade, without holding your foot on the brake pedal. It worked very nice.

\* \* \* \* \* \*

"X–Q. 180. As a matter of fact, this cock valve did not lock the liquid in very well, did it? Yes, it did.

"X–Q. 181. It did not leak? A. It leaked after you held it in too long. There were limits to its capabilities.

"X–Q. 182. Would the pressure with which you applied the brakes have anything to do with whether there would be leakage around the bearings, around the cock valve? A. Yes, it would."

The general purport of the testimony of appellant with respect to the tests was the same as that of his witnesses. He had the use of the borrowed car for only two days. It was shown to a number of Plymouth dealers "along Broadway and Lawrence Avenue," but actual driving tests seem to have been limited to those above described.

The question is, did the tests demonstrate the device to be successful? That Exhibit 2, in the condition in which tested, would not have been commercially satisfactory is obvious, but it is well settled that there may be a reduction to practice by use of a device not commercially successful. This principle often has been stated and applied by the courts. In the case of Hildreth v. Mastoras, 257 U.S. 27, 34, 42 S.Ct. 20, 23, 66 L.Ed. 112, the Supreme Court stated it as follows: "It is not necessary, in order to sustain a generic patent, to show that the device is a commercial success. The machine patented may be imperfect in its operation; but if it embodies the generic principle and works, that is, if it actually and mechanically performs, though only in a crude way, the important function by which it makes the substantial change claimed for it in the art, it is enough. Telephone Cases, 126 U.S. 1, 535, 8 S.Ct. 778, 31 L.Ed. 863; Mergenthaler Linotype Co. v. Press Publishing Co. (C.C.); 57 F. 502, 505."

Measured by the principle thus stated, we are of the opinion that the Examiner of Interferences reached the correct conclusion in this case. We approve the following taken from his decision: "It is believed that the testimony with respect to the tests of Exhibit 2 in August, 1932, tends to show that the device worked sufficiently well to constitute a reduction to practice. The leakage of brake fluid around the swing cock of Exhibit 2 when the brakes were applied is an admitted fact, and after awhile would result in release of the brakes. However each of the four witnesses testified that the car would remain motionless for a considerable period after the brake pedal had been released due to the operation of Exhibit 2. While there might be a few instances in which it would be desirable to hold a vehicle indefinitely in this manner, it is obvious that the minute

or so the device would hold the vehicle stationary would be ample for the performance of the usual operations of shifting the operator's foot from the brake to the accelerator or even attempting to restart a stalled engine. Thus in its present form Exhibit 2 has a considerable utility. Leakage would exist, it is true, but the best commercial systems of hydraulic brakes experience some leakage and provide a reservoir of excess fluid to make up such losses. Thus an absolutely fluid-tight system is not the accepted criterion of a successful device in this art."

It was clearly demonstrated, we think, that appellant's device involved the generic principle, and that it worked for a sufficient period of time to show that the application of the principle solved the problem. As between the parties here involved, he admittedly was the first to conceive and the first to make a device which embodied the principle of the counts. So far as the record shows appellee never made or tested a device before the filing of his application.

Appellee argues that "The contention that the tested apparatus could have been made over into an operative apparatus, without exercise of inventive faculties, is without merit here" and cites our decision in the case of Preston et al. v. White, 97 F.2d 160, 25 C.C.P.A., Patents, 1219, where we held, in effect, that it could not properly be assumed that because a stop light switch worked in a certain relationship, it would work in another relationship. To that statement of law we, of course, adhere but that is not this case. Appellants in that case were denied the relief sought because they failed to produce testimony corroborative of their own testimony that they had tested the switch in the combination which was the essence of the invention at issue. Indeed, we said there that it was not clear even from the testimony of appellants that the switch light operated successfully in combination with the brake system, and there was a total absence of any testimony upon this point by any of appellants' corroborating witnesses.

Here appellant is amply corroborated by disinterested witnesses at to what actually was done by way of tests and the sole question is whether the tests were sufficient to meet the requirements of the rule relating to reduction to practice.

It is further argued on behalf of appellee that only a showing that a "fully loaded vehicle" was held for "an indefinite period" would satisfy the rule; that "It cannot be found that there is any proof that more than two persons were in the car at any time that a test was made * * *," and that the brief period, only "a few seconds," the brief alleges, during which the car was held was not a sufficient demonstration. Also, it is argued that there is no evidence as to the steepness of the grade and of the ramp upon which the tests were made.

These contentions have been carefully weighed. It may be said that the counts do not contain any specification as to the amount of load in the car, nor as to any period of time; neither is anything said in the counts about the steepness of the grade. Indeed, the term "grade" is not used in any one of them.

The witness Jacobsen described the street test as being "just on a normally sloped street," and said of the ramp that it was "very steep." As for the time the car was held before any slipping took place, the witness Krez said, as quoted above, "It was only after an interim of possibly, it would seem to me, a minute or so, that there would be—you would notice a slight sliding back, but the car held stationary." The witness Spevak named no particular time, but said that after Leichsenring made an adjustment "it held good" on the ramp. At another point when asked how long he held the car still on the incline he answered: "Oh, I would say, maybe fifteen or twenty seconds." It should be borne in mind that the import of the answer was that he *held* it for that time, and there is nothing to indicate that he could not have held it longer had he desired. Upon the contrary, taking the testimony as a whole, it seems fairly inferable that after the adjustment by appellant while the test on the ramp was being made, it would have held longer. The witness Jacobsen was quite positive in the statement that "it performed what it was supposed to perform to hold the car on a grade, without holding your foot on the brake pedal" and that "It worked very nice." The length of time one wishes to hold a vehicle naturally varies with circumstances, and we deem the showing made to be sufficient in that regard. So far as the amount of the load is concerned we take that as a matter of degree which the counts do not define. It is fairly inferable that a greater pressure would have to be maintained on a heavily

loaded truck than on a light passenger car, loaded or unloaded, but the counts seem to us to be satisfied where the holding of any automotive vehicle is satisfactorily demonstrated.

Upon the matter of leakage and the matter of having to add fluid to the master cylinder "more than once" during the experiments, it seems not improper to point out that some, at least, of the fluid was lost when a nut was removed for the purpose of making adjustments, and not all the loss of fluid occurred while the car was being operated. As has been said, however, leakage of fluid while the tests were being made is conceded, this being obviously due to the fact that the swing cock did not fit tightly.

Upon full consideration we agree with the Examiner of Interferences rather than the board, and the decision of the latter is reversed.

Reversed.