33 C.C.P.A.(Patents)

## LUSTIG v. LEGAT.

### Patent Appeals No. 5155.

Court of Customs and Patent Appeals.

April 1, 1946.

Rockwell & Bartholow, of New Haven, Conn. (Henry E. Rockwell and Edmond M. Bartholow, both of New Haven, Conn., and Edwin R. Hutchinson, of Washington, D. C., of counsel), for appellant.

Briesen & Schrenk, of New York City (Fred A. Klein and John J. Hart, both of New York City, of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

BLAND, Associate Judge.

The senior party, Egon Lustig, appeals here from the decision of the Board of Interference Examiners of the United States Patent Office awarding priority of invention of the single count involved in this interference to the junior party, Robert C. Legat.

The interference involves patent No. 2,-224,082, granted December 3, 1940, to Legat upon an application filed August 30, 1939, and an application of Lustig, filed November 18, 1941, for reissue of original patent No. 2,238,653, granted April 15, 1941, upon an application filed December 6, 1938. The Lustig application and his original patent are assigned to

A. J. Rosenstein, who is president of Myrtle Knitting Mills, Inc., which corporation manufactures sweaters and other types of knitted wear upon which slide fasteners are employed. Legat's assignee is the G. E. Prentice Manufacturing Company; it manufactures slide fasteners or zippers of a type to which the invention here involved and hereinafter described relates.

The invention relates to "sliders" for slide fasteners commonly called "zippers." The inventive feature of the subject matter in issue resides in providing a metallic slider which can be produced cheaply but which has a locking action independent of any automatic or other added device connected therewith. The devices of the parties hereto, and that which is defined by the single count, have outer side walls so spaced and shaped that when a lateral pull is exerted on the fastener above the slider there will be a jamming or wedging action which prevents movement of the slider in the opening direction.

Since it will not be necessary to consider the right of either party to make the count it will be unnecessary to here reproduce it. In view of our conclusion, the sole issue is one of priority and we find it unnecessary to consider the testimonial record of Lustig.

The count originated in the Legat application. Legat alleged in his preliminary statement the date of November 20, 1936, for the first disclosure of the invention to others and the same date for the completion of a full-size device embodying the invention; also reasonable diligence in adapting and perfecting the invention from that date.

The party Lustig, at the time of making the invention, resided in Czechoslovakia and made his invention abroad. He introduced it into the United States by sending a sample fastener embodying the invention to the Myrtle Knitting Mills, Inc., which sample, Lustig alleges, was received by the company's president, Mr. Rosenstein, on April 6, 1937, and was examined and understood. This date is accepted by the Patent Office and by us as being the earliest date to which Lustig would be entitled in establishing his priority in this appeal.

Both parties took testimony. The junior party, Legat, produced the testimony of himself and eight witnesses, and Lustig that of four witnesses.

The testimony of Legat's witnesses has been summed up and exhaustively discussed by the board. We approve of its findings and no useful purpose would be served by repeating at great length what has in detail been stated by it.

The record discloses that in 1935 Czechoslovakia was the principal supplier of slide fasteners to this country but that early in 1936 Japanese competition became very severe owing to the cheapness of Japanese production; that as patents expired greater competition ensued and that hearings were had before the United States Tariff Commission with the view of having the tariff duty raised on fasteners. But during this procedure Legat's company, the G. E. Prentice Manufacturing Company, undertook to produce a fastener with a locking feature and which could be manufactured to compete with the imported articles. In order to do so it was necessary to get away from the more expensive automatic locking devices and others such as were then on the market which were unsatisfactory or were expensive to produce.

Legat, superintendent of the company, became interested with his associates in solving the problem and in 1935 produced a fastener called the Z slider which had a sharp point on each upper side of the slider that would catch an element of the fastener if the tapes or stringers were pulled sideways. The points did not wear well and complaints came in and the salesmen demanded improvements.

A sales meeting was held at New Britain, Connecticut, on December 28, 29 and 30, 1936, as is evidenced by testimony and by a letter, Exhibit 11. Before the sales meeting Legat was able to produce a handmade improved sample, Exhibit 2, which he claims to be a complete reduction to practice of the invention. This slider was shown to the salesmen, which fact is testified to by several of the witnesses. It is also stated that its manner of performing was satisfactory and was thoroughly understood, that the exhibit was passed around to all the salesmen who tested it by pulling on the ends of the stringers and found that it locked properly. There is much harmonious testimony by several witnesses on this phase of the case.

Unquestionably unless the credibility of the witnesses is attacked (and the appellant expressly declines to do so) it must be believed that Exhibit 2 was produced, disclosed and tested in the late winter of

1936. The only objection found to the device was as to its size; owing to the various uses for slide fasteners it was important that the size be reduced. A smaller slider, Exhibit 3, was made soon after the meeting and it is established that it worked more satisfactorily than Exhibit 2.

It was then decided to make the dies immediately, and dimensions for them were laid out by Conlin, the mechanical superintendent. George Gilbert, a tool and die worker, testified at length as to his work in making the dies under Conlin's directions. Gilbert left the plant March 25, 1937, and was away for about a year. He stated that he did this work before he left and other witnesses testified to the same effect. That he left the company in March, 1937, is conclusively shown by the record.

The dies were adapted for separate operations wherein the operator had to move the blank from one step to the next. They were turned in and sold in a scrap drive after automatic dies had been made.

All these things occurred in the latter part of 1936 or the early part of 1937. Gilbert took the blanks which were offered as Exhibits 7 and 8 when he left the plant in 1937. Exhibits 4 and 5 are early sliders made from such die made parts, Exhibit 5 having an opening cut in the slider to show the internal parts.

Gilbert testified that sliders like Exhibit 4 had been made and were operating satisfactorily before he left, and Gordon Porter, who had charge of the New York sales office, stated that he saw what occurred in the inside of the slider in March, 1937, by being shown Exhibit 5. This exhibit reveals the jamming action called for by the count.

Conlin testified that specimens were tested before Gilbert left and that Exhibit 4 is a sample made in March, 1937, and kept by Legat. Other witnesses testified to the same effect.

Unquestionably Legat's record establishes that prior to April 6, 1937, the earliest date awarded Lustig, Legat had conceived and, with the help of his fellow employees, had produced and had disclosed to a number of persons the invention defined by the count, and had successfully demonstrated, by the tests aforesaid, that it would satisfactorily perform in accordance with the requirements of the count.

Other exhibits are in evidence but the salient facts heretofore related will suffice for our purposes without going into the details of the record as did the board.

As is pointed out by the board, the date of Gilbert's departure from the company is definitely established as March 25, 1937. The sales meeting at which the Legat device was disclosed and tested was held before he left, and since he left in the spring of 1937 and the sales meetings were always held at the end of every year there can be no doubt that the events testified to as happening at the sales meeting occurred in 1936 rather than later as is contended for by Lustig.

The burden of Lustig's argument here is to the effect that the board improperly awarded priority to Legat upon a record most of which consisted of oral testimony and which was adduced a number of years after the events were alleged to have happened. Lustig complains of a lack of sufficient documentary evidence, particularly records kept by corporations such as that of Legat's assignee relating to work shop drawings, time cards, etc.

 It is too well settled in patent law to require extended discussion or citation of authority in support thereof that one may prove his priority of invention by oral testimony alone. It is true the courts scrutinize such testimony with care because of the possibility of fraud, mistake or bad memory bringing about improper results, but no court, to our knowledge, has ever held that one cannot establish priority by oral proof, and it very often occurs that priority is established in a most convincing way by oral proof, particularly where there is lack of inconsistency in the testimony of the witnesses and where there are related facts shown in the record, as are shown in the instant one, corroborating such testimony. Moreover, Legat's instant record contains considerable documentary evidence which supports and strengthens and gives convincing character to the testimony of Legat and his witnesses.

There is but one important question of law involved in this appeal and that relates to reduction to practice. Lustig urges that since he is entitled to April 6, 1937, as his date for reduction to practice it was incumbent upon Legat to show that prior to that date he had successfully tested the device and proven its utility by applying it to a garment and giving it such tests as it would undergo while the garment was

being worn, or that if Legat be awarded conception upon the record that he be required to show diligence during the critical period.

On the question of reduction to practice the board said:

"Besides questioning the date, Lustig also contends that the Legat device was not reduced to practice because it was not tested in a garment. In this connection, it is interesting to examine the standard set up by Lustig for a reduction to practice in testing his own device. Lustig's original preliminary statement did not allege a reduction to practice, and was criticised for that reason (paper 7). Lustig then filed his preliminary statement included on pages 4 and 5 of his record, which in this connection recites: 'That he introduced the invention into the United States by shipping a sample fastener embodying his invention, to Myrtle Knitting Mills, Incorporated, Unionville, Connecticut, which he believes was received in the United States on or about April 1, 1937, and received by, and examined and understood, by, A. J. Rosenstein of Myrtle Knitting Mills, Incorporated, on or about April 6, 1937.'

"Unless such acts constitute a reduction to practice, Lustig has no allegation of a reduction to practice in his preliminary statement."

The board quotes from the Lustig record and points out that by applying the Lustig test, that is, manually pulling the tapes holding the elements, Lustig's assignee found the slider very satisfactory and that it was not until later that he mentioned testing it on a sweater. The board also quotes from the testimony of the assignee's brother, Nathan Rosenstein, giving the results of the tests of the fastener on a sweater, and then states:

"It seems evident * * * that the witness considers the manual test the more strenuous, and from the yieldable nature of the material in a sweater it is apparent that a more positive and effective pull can be made by hand. At the conclusion of his testimony, Lustig's assignee admits he was convinced by the manual test, as follows:

" 'Q. When you got the first sample, as you say, on April 6 and you pulled apart the stringers, were you satisfied with its locking operation? A. Yes.

" 'Q. You had what in your mind was from a commercial point of view satisfactory to you? A. Yes.'

"Tests and demonstrations of the character referred to in Legat's testimony are accordingly deemed sufficient to establish that the slider is satisfactory, and that it satisfactorily performs its locking function."

The board concluded in substance that if the Lustig standard of testing sliders was regarded as sufficient by Lustig he is in a poor position to complain about the thorough tests disclosed in the Legat record. Appellant has assigned as error the action of the board in applying the said Lustig test as a standard for reduction to practice by Legat.

■ Of course, what Lustig did does not alone prove that Legat's test fully complied with the requirements of the law and if this were all the testimony upon·which the board based its opinion that proper tests were made by Legat we could not agree with it in its conclusion. But we see no impropriety in referring to the Lustig test as bearing upon the question as to what is the approved practice in testing this kind of a device. The evidence that Rosenstein was at first satisfied by examining the imported slider and pulling on it in the usual way to see if it would perform the wedging action is some evidence going to the question as to what is regarded by those most concerned as a proper test of the invention.

In Goodale v. Lund, 96 F.2d 840, 841, 25 C.C.P.A., Patents, 1148, air valves for steam radiators were shop tested upon apparatus "designed to simulate conditions of a heating system." This was held to be sufficient for a reduction to practice and it was pointed out that that character of tests were those generally resorted to by the Dole Valve Company, the assignee of one of the applicants, in its efforts to ascertain the commercial practicability of air valves for steam heating systems.

In Bowers v. Valley et al., 149 F.2d 284, 32 C.C.P.A., Patents, 1039, a carbon removing piston ring for internal combustion engines was shop tested with a high pressure air compressor to ascertain the utility of the ring. The record showed that the conditions under which the pump operated on the ring, although there was no internal explosion, simulated closely a testing in an internal combustion engine. We declined to state whether or not the testing of the piston ring under these circumstances would be proper, since it was not necessary to the decision of the case

684

in view of the fact that the party making the test did not show that it satisfactorily performed the functions defined in the counts involved. We there stated that, under the circumstances, rings to be used in internal combustion engines might be satisfactorily tested in the shop rather than in the engine itself. The evidence in that case relating to shop tests was that the tests were made by the Power Research Corporation which was engaged in the making and testing of piston rings and that their testing was done not in the engine itself but as heretofore stated.

 We think the tests made by Legat under the circumstances of this case were sufficient to comply with the requirements of the law. As to whether or not tests other than under the actual conditions in which the article is used are sufficient depends upon the character of the article, which may be conveniently divided into three categories: (1) Those which are so simple in nature that no test is required to ascertain that they will fully and satisfactorily perform the functions intended. See Sachs v. Wadsworth, 48 F.2d 928, 18 C.C.P.A., Patents, 1284; Mason v. Hepburn, 13 App.D.C. 86. (2) Those articles of such character that they may be affected by many different conditions and therefore their utility can only be tested by trying them out in the use for which they are designed. See Payne v. Hurley, 71 F.2d 208, 21 C.C.P.A., Patents, 1144. (3) Articles of such character that a shop or laboratory test or other suitable test, made under conditions that are "comparable" to those of the actual operating conditions of the device, is sufficient to show that satisfactory results will be obtained. See Sperry v. Aufiero et al., 134 F.2d 174, 30 C.C.P.A., Patents, 908, and the numerous cases therein cited.

It seems apparent that where men skilled in the zipper art take hold of the two pieces of connected cloth to which the metal parts of the zipper are attached and pull crossways to see if the zipper will lock or come unlocked this is a more severe test than if it was actually sewed upon a garment and tested on the wearer.

It must be remembered that zipper devices are not new and that their general mechanism is thoroughly understood by those skilled in the art and generally understood by many others. The problem presented to Legat and his associates was whether or not when a cross pulling strain

was brought upon the two cooperating elements between which the slider operated the device would wedge and lock and not slip. It is well settled that tests as evidence of reduction to practice do not need to show the impossibility of failure but only the probability that the device tested would not fail. Taylor v. Swingle, 136 F.2d 914, 30 C.C.P.A., Patents, 1219.

Legat being the first to conceive and the first to reduce to practice was properly awarded priority of invention of the involved count by the Board of Interference Examiners, and its decision so doing is affirmed.

Affirmed.