28 C.C.P.A.(Patents)

## VAN CLEEF v. TIERNEY.

### Patent Appeal No. 4408.

Court of Customs and Patent Appeals.

April 14, 1941.

Fred Gerlach and Norman H. Gerlach, both of Chicago, Ill. (Charles E. Riordon, of Washington, D. C., of counsel), for appellant.

Paul Carpenter, of Chicago, Ill. (Robert I. Coulter, of Chicago, Ill., and Charles S. Grindle, of Washington, D. C., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming that of the Examiner of Interferences awarding priority to the party Tierney in an interference proceeding instituted between a patent to Van Cleef and an application of Tierney, the subject matter being broadly described as adhesive tape.

Four counts are involved, all being for the article.

As the issue is presented here it is sufficient to quote counts 1 and 3 for illustrative purposes:

"Count 1. As a new article of manufacture, a tape comprising a strip of rubber hydrohalide and a coating of pressure sensitive rubber base adhesive on one face of the strip."

"Count 3. As a new article of manufacture, a tape comprising a strip of rubber hydrohalide, a bonding coat with rubber therein fixed to one face of the strip, and a coating or film of pressure sensitive rubber base adhesive on the bonding coat."

It may be stated that a fifth count relating to a process was involved below; that Van Cleef was awarded priority as to it by the Examiner of Interferences and that Tierney took no appeal from that decision.

The decision of the Examiner of Interferences embraced the following descriptive matter: " * * * Prior to the invention in issue transparent pressure sensitive adhesive tapes had been on the market in the form of backing strips of transparent paper or regenerated cellulose, coated with a transparent pressure sensitive adhesive. The adhesive generally used appears to have been mainly rubber and resin combined in such proportions as to result in a pressure sensitive adhesive mass, i. e., a mass capable of adhering to the surface of other substances with which it comes in contact without the use of heat or solvents. A primer, comprising rubber and a resin, was also generally used to secure the adhesive coating to the backing so that the adhesive would not peel easily from the backing. The involved invention is directed in substance to a tape of the kind described in which the conventional paper or regenerated cellulose backing is replaced by a backing of rubber hydrohalide which, in this instance, is a transparent rubber hydrochloride manufactured in sheet form under the trade name of 'pliofilm,' by which name the material will be referred to herein."

The patent to Van Cleef, No. 2,084,878, was granted June 22, 1937, upon an application filed May 25, 1936. It was assigned to Van Cleef Bros., a copartnership of which the patentee is a member.

The application of Tierney, stated to be assigned to his employer, the Minnesota Mining and Manufacturing Company (hereinafter referred to as the M. & M. Co.), was filed January 3, 1938, more than six months after the issuance of the Van Cleef patent from which the involved

counts were copied, and apparently after Tierney had actual notice of the patent.

Under such circumstances, it was incumbent upon Tierney, or his assignee, to establish priority beyond a reasonable doubt.

Both parties took testimony, and the issue was finally resolved into one of whether Tierney had established reduction to practice of the invention on December 28, 1934, which was held, and which is conceded, to be at least six days prior to any date which could be awarded to Van Cleef. That date was awarded Tierney by the tribunals below.

Since this is the sole issue, it is unnecessary to recite or discuss the claims made in the respective preliminary statements, nor is it necessary to set forth a review of the testimony in detail. Its pertinent parts were reviewed by both the tribunals below, the review of the Examiner of Interferences being quite elaborate.

We agree with the tribunals below that the evidence establishes the production of tape made on December 28, 1934, at the M. & M. Co. plant under Tierney's direction and that outwardly it conformed in texture and appearance with the tape described in the counts. A sample of the tape so produced was introduced in evidence as Tierney's Exhibit U and is a part of the record before us. It appears to have been made on a machine which the company used regularly in the manufacture of cellophane tape, a product which it was marketing. Incidentally, it may be said that Van Cleef in making the invention appears to have been seeking a product to be marketed, in part at least, in competition with the cellophane tape.

Appellant's reasons of appeal assign numerous errors, which may be summed up broadly as claiming that the work done by, or under the direction of, Tierney on or about December 28, 1934, amounted to no more than "an abandoned or unsatisfactory experiment," and did not constitute a reduction to practice.

We are in agreement with the contention of appellant to the effect that under the facts and circumstances appearing in this case the testimony relating to Tierney's claimed reduction to practice must be carefully scrutinized and that any reasonable doubt as to the fact must be resolved against him.

The testimony on Tierney's behalf consisted of his own statements and those of his associate employees of the M. & M.

Company. It is not disputed that after the tape was produced in December 1928, the sample was laid aside without being put to any of the uses for which it was designed.

In Tierney's specification it is said: "With respect to the characteristics of adhesive tapes or sheet material, made according to this invention, reference is particularly made to materials for use as: a removable and re-usable adhesive tape, surgical tape, transparent surgical tape, frost shield tape, transparent packaging tape, masking tape, ceramic tape, electrical insulating tape, can sealing tape, tape to replace viscose coverings on bottles, bookbinding tape, repair tape, and in general may be applied to any analogous purpose to which a protective wrapping, covering, or splicing might apply."

There is no evidence that the article produced December 28, 1934, was given any test except one which a witness defined as "an adhesion test." It was not shown to have been tried for packaging, masking, insulating book-binding, or any of the other purposes defined in Tierney's specification, or for any other purpose showing utility. There is some evidence indicating that samples made subsequent to the filing date of Van Cleef were tested by use. For example, one sample was stated to have been used for sealing the edge of a slip cover can of Crisco, apparently in May, 1937. The critical date for Tierney, however, is December 28, 1934, and in no event could the tests made after Van Cleef's filing date be of aid to Tierney on the matter of reduction to practice.

The Examiner of Interferences (and, following him, the board) evidently took the view that the making of the article and the adhesion test were sufficient to meet the legal requirements respecting reduction to practice, and it is quite earnestly insisted on behalf of Tierney that the exhibit on file speaks for itself; that it is simple in character and that its "purpose and efficacy are so obvious, that a complete construction is all that is necessary to show utility to persons skilled in the art," various cases being cited in which the principle of res ipsa loquitur has been held applicable.

We feel constrained to differ with the tribunals below and the contentions of Tierney upon this point. In the case of Hurd v. Smith, 97 F.2d 147, 25 C.C.P.A., Patents, 1137, in its discussion of the re-

quirements relating to reduction to practice this court said that each question of this character must be determined according to the particular nature of the device involved. In the present instance Tierney sought to produce a tape having various uses from materials, some at least of which were new in the tape making art. Tierney's specification states:

"Adhesive tapes heretofore known to me are further subject to the following objections: (1) Limited flexibility, which if flexed beyond that limit results in cracking or breakage of the backing; (2) Susceptibility to tear, the property which is common in the transparent tape now in use generally recognized and well illustrated by "Cellophane" which when once started has no resistance; (3) Susceptibility to puncture, particularly when slight stress is present at any one point; (4) Being affected by changes in humidity and normal temperature conditions, e. g. certain tapes in present use during the winter months are affected by brittleness, causing breakage due to lack of atmospheric moisture, and in the summer, difficulties in trade usage, in addition to the susceptibility of being affected by moisture having a tendency in roll form to telescope and ooze. Telescoping is the tendency of rolled adhesive to displace the center from alignment with the conformity of the roll in its natural shape. Oozing is the tendency of the adhesive to creep out, making the edges of the roll sticky and lessening the value of the tape when it is applied for the purpose intended; (5) susceptibility of attack by ordinary chemical solvents; (6) a tendency to promote corrosion when used as an electrical insulating tape; (7) gapping, i. e. the tape, when rolled is subject to humping up at some point and then, upon unwinding by the customer a break occurs, or the adhesive blisters and transfers at this point; (8) manufacturing difficulties wherein the producer is limited to technical detail in obtaining a fine point of adhesive aggressiveness with each individual run, and further care must be taken in cutting, for the use of a poor knife, i. e. one with a dull or nicked edge, results in breakage when the material is unwound.

"From development and use, it may readily be recognized that the provision of an adhesive tape or sheet material, applicable for general purposes as splicing, covering, binding and the like overcoming the above enumerated objections, and with the following objects in view, provides advantages heretofore unattained with like materials now known to the trade.

"It is therefore a principal object of my invention to provide an adhesive tape or sheet which retains its desirable characteristics irrespective of abnormal or changing atmospheric conditions.

"Other objects of my invention are to provide: a transparent film backing for tape which is impervious to water, and resistant to the stronger acids and alkalies; an adhesive tape possessing transparency, resiliency, and flexibility; an adhesive tape possessing inherent characteristics of toughness and resistance to abnormal stresses; tape backings inducive to extreme thinness of film; an adhesive tape possessing high dielectric strength which gives no corrosion when used as an electrical tape, or for other insulation purposes."

We are of the opinion that Tierney's record, taken as a whole, strongly indicates that the officials of the M. & M. Company did not regard the article produced December 28, 1934, as being a satisfactory tape. The pliofilm used in its making was run through a coating machine regularly used for coating cellophane tape. Benzol was used as a solvent for the coating on the pliofilm and this required oven drying for evaporation. The web was subjected to tension or pull and heated. This, Tierney conceded, resulted in stretching and distorting the backing.

Mr. Henry W. Berg, who in December, 1934, appears to have been "head coater" of the tape making department of the M. & M. Company, testified on direct examination, in part, as follows:

"Q. 28. Do you know what pliofilm is? Is there anything that brings it to your mind? A. 28. Yes, I do. I know particularly it has a sort of rubber tendency different than regular cellophane. Rubber cellophane is of a different texture. This pliofilm you can stick your finger up underneath it and it will stretch, and it will whiten where your finger shows and it has a rubber tendency.

* * *

"Q. 32. Do you have any recollection of how this pliofilm adhesive tape looked as it was going through the machine when the first run was made? A. 32. Yes, I do. That is one thing I recollect, because when that left the coating knife, if I am not mistaken, I think it was on a 21 inch width going through the coating knife and that

passed through the drying ovens. What we call a double web went down to the end of the oven and back and then made another passage around the roller. That was a sixty yard span, and when it came out of this drying oven it had curled up on the edges so I think the widest part was about 12 inches wide and it stretched out to about 122 yards instead of 60. The tally going into the coating knife registered 60 yards. That is what we call one oven full. From the time it goes into the oven until it comes out it is 60 yards, but we had about 122 yards of tape that was only about from 9 inches to a foot wide.

"Q. 33. Did that make a product which had the characteristics of an adhesive tape, or was it something that you just threw away? A. 33. No. What there was of it I would say was good tape; what we did salvage. I don't want to state how much we did get out of that. I wouldn't say we slit over 6 or 8 inches, that is, on width."

Mr. R. P. Carlton, vice president of the M. & M. Company, in charge of manufacturing, was asked, in substance, on direct examination, if he knew what his attitude was toward pliofilm pressure sensitive tape *during the years 1935, and 1936,* and replied, *"I thought it had possibilities."* (Italics ours.) His testimony continued:

"Q. 43. Did you think it was of such a nature that it had immediate possibilities for commercial sale? A. 43. Well, there were some objections to it and that slowed up the activity some. That feature of stretching considerably when you would unwind it from the roll, and it showed a milkiness when you put on some tension. That was considered an objection and it was discussed with Dr. Sebrell of Goodyear on several occasions and we made an attempt to improve the characteristics of the film by controlling the flexibility of the film by using different thicknesses of the film but there was an objection to it for general all around use that wasn't immediately overcome, and I don't know whether it is entirely overcome now."

Mr. John Arthur Borden, sales manager of the M. & M. Company, testified, with respect to a sample of the article, that "there were certain things which weren't quite right"; that it was "very distensible"; that the "backing would stretch too much"; that he believed "the early samples had quite a lot of static in that pliofilm backing"; that it "was cloudy in

appearance; a sort of dark green appearance rather than the crystal clear appearance of Cellophane"; that he "saw a lot of value in the pliofilm" and "told the Laboratory to keep on experimenting until they got rid of the disadvantages that we saw"; that they were still continuing to experiment at the time his testimony was taken in 1938.

Mr. Frank P. Vogel, who was foreman of the tape making department of the M. & M. Company in December, 1934, testified, with respect to the product resulting from the December, 1934, experiment that "it was somewhat more ragged than tape"; that it had "A lot of stretch and curled up"; that it was "irregular."

Other testimony need not be stated in detail. All the witnesses appear to have been quite frank in their statements, and the tenor of their testimony, as a whole, is such that we are not convinced that the article produced December 28, 1934, amounted to anything more than an abandoned experiment and, hence, may not be properly regarded as a reduction to practice of the invention. We do not overlook the fact that certain of the testimony may be construed as indicating merely that the article was not regarded as being a commercially satisfactory tape, nor do we overlook the rule that there may be a reduction to practice sufficient to meet the requirements of the patent laws without the article being commercially practical; also, we have given due consideration to the *opinions* expressed by Tierney's witnesses to the effect that the sample was satisfactory. After considering all those matters, however, it is our conclusion that appellee failed to establish the essential elements of his case beyond a reasonable doubt.

A circumstance which, in our opinion (when considered in connection with the testimony), weighs heavily against appellee and strongly indicates that his was an abandoned experiment, is the long delay in filing the application for patent coupled with the fact that it was not filed until after Tierney had examined Van Cleef's patent.

The question presented here is primarily one of fact, and it is seldom that any two cases are on all fours as to their facts. So, it is not easy to find authorities altogether analogous, but the cases of Evans v. Richard, 36 F.2d 287, 17 C.C.P.A., Patents, 653,

**916**

and Severson v. Olson, 64 F.2d 694, 20 C.C. P.A., Patents 946, are deemed pertinent.

For the reasons indicated, the decision of the board affirming the decision of the examiner is reversed and priority awarded to the party Van Cleef.

· Reversed.