47 CCPA

**Arthur W. SCHNICK**

v.

**Lawrence E. FENN.**

**Patent Appeal No. 6479.**

United States Court of Customs
and Patent Appeals.

April 12, 1960.

As Modified June 1, 1960.

Irvin H. Rimel, Cushman, Darby &
Cushman, Washington, D. C. (John W.
Malley, Washington, D. C., of counsel),
for appellant.

Ernest M. Junkins, Jr., Bridgeport,
Conn. (Stephen H. Philbin, of Fish,
Richardson & Neave, New York City, of
counsel), for appellee.

Before WORLEY, Chief Judge, RICH,
MARTIN and SMITH, Judges, and
Judge WILLIAM H. KIRKPATRICK.*

MARTIN, Judge.

This appeal is from the decision of
the Patent Office Board of Patent Inter-
ferences in Interference No. 87,714
awarding priority to the junior party
Fenn.

The appellant, senior party Schnick, on
September 16, 1952 filed application
Serial No. 309,865 entitled "Electrical
Heating Unit." Schnick was an employee
of Cuno Engineering Corporation (to be
referred to hereinafter as Cuno), to
which the application is assigned, and
was engaged in cigar lighter develop-
ment work in March 1952, the time at
which he concededly conceived the inven-
tion embodied in the counts at bar.

The junior party Fenn, appellee here,
filed application Serial No. 320,071 enti-
tled "Heating Element for Cigar Light-
ers" on November 12, 1952. At the time

---

* United States Senior District Judge for the
Eastern District of Pennsylvania, desig-
nated to participate *in place of Judge*

O'CONNELL, pursuant to provisions of
Section 294(d), Title 28 United States
Code.

he alleges he conceived and reduced to practice the invention here in issue, Fenn was executive vice president of Casco Products Corporation (hereinafter called Casco), and at the time testimony was taken, was president of Casco, licensee of the Fenn application.

The counts in controversy are:

"1. A cordless electric cigar lighter plug of the type adapted to be housed and heated in a socket and to be separated therefrom for use, a heating element comprising a spirally wound annulus of resistence ribbon of segmental tubular cross-section along at least a portion of its length, successive courses of said spiral being substantially in contact each with the next whereby said annulus resists deformation in an axial direction, said courses being insulated from each other at their points of contact solely by an insulating oxide formed on the surface of said ribbon, terminals for said heating element, one of said terminals comprising a metallic carrier on said plug connected to the outer end of said heating element.

"2. The invention as defined in count 1, wherein said carrier is a cup enclosing said heating element.

"3. The invention as defined in count 1, wherein said ribbon is substantially V-shaped in cross-section.

"4. The invention as described in count 1, wherein said ribbon is substantially arcuate in cross-section."

The invention resides in heating elements intended primarily for, and utilized as, automobile cigar lighters. In 1951, both Cuno and Casco, apparently the two largest cigar lighter manufacturers in the country, learned that automobile manufacturers were contemplating a change-over to 12-volt electrical systems from the then standard 6-volt systems for passenger vehicles. A 12-volt electrical system necessitated 12-volt cigarette lighters. Ohm's law would suggest the use of a resistance wire half the thickness and twice the length of the flat ribbon then used in the 6-volt lighters. However the decreased cross-section posed two serious problems from practical and mass production standpoints. First, thin metal (0.01 inch) tended to distort and creep in an axial direction upon repeated heating to elevated temperatures, which meant that a heating element soon lost its desirable flat igniting surface. Secondly, the greater length of the ribbon required closer spacing of the successive courses to enable the wound coil to fit the cup into which it was eventually welded. That presented a need for some means for insulating the turns of the coil to prevent short circuiting.

In March 1952, Schnick allegedly formed an aluminum containing alloy ribbon having a V-shaped cross section, wound it tightly into a coil, and welded it into a cup in that tightly wound condition. Fenn claims that in April 1951 he and his associates formed a V-shaped ribbon of an aluminum alloy, wound it into a coil, and welded the coil into a cup, the turns of the coil being close enough together so that they restrained movement in an axial direction. The aluminum alloy "Kanthal" was used by both so that when wound into coils and upon heating, an aluminum oxide coating, an insulator, would be formed on the surfaces of the ribbon to provide self-insulated coils, thus obviating the need for an additional insulating means such as ceramic.

Appellant has assailed virtually every holding made by the Board of Patent Interferences and appellee's arguments are substantially a reaffirmation of the board's position.

The basic issues confronting us in this case are:

1. Was the board's interpretation of the counts proper?

2. Did Fenn conceive a device upon which the counts can be read?

3. Were Fenn's reductions to practice proven by the proper type and quantum of evidence?

4. Was there abandonment, concealment or suppression of the Fenn invention prior to the filing of an application thereon in November 1952?

Appellant contends that all of the counts require the ribbon to be tightly wound so that all of the faces of adjacent courses are in contact with each other, those faces being insulated from each other solely by the aluminum oxide layer on their surfaces.

The board was of the opinion that the counts were not so limited, that they merely required the successive courses to be so interlocked that axial distortion was prevented, and that the oxide insulation was required only where the faces of the interlocking turns actually contacted each other. That, the board felt was a reasonable construction of the count and since its terms were found to be unambiguous, resort to the Schnick application for interpretation was considered to be unnecessary. Even had that been necessary appellant's construction was held to be required neither by the specification nor by the original claims.

In connection with the issue of priority, the junior party has not attempted to prove diligence. Fenn's proofs are directed solely to establishing reduction to practice prior to late March, 1952, the uncontested dates of conception and reduction to practice by Schnick.

The board stated that the parties should be held to the same standard of proof with respect to the question of reduction to practice. Both parties were felt to have been satisfied that their elements were suitable for the intended purpose after only preliminary tests. It was held that testing to the point where a fully satisfactory commercial model was obtained was not necessary in the cigar lighter art, especial reliance being placed upon Sinko Tool & Mfg. Co. v. Automatic Devices Corp., 2 Cir., 157 F. 2d 974. The testing required to prove a reduction to practice was held to be no more than that which showed "clearance or lack of shorts, lack of severe distortion along with self-retention of the coils and some promise of durability." The board also found that Schnick's own proofs of March 1952 did not establish that tightness was the gist of the invention (as is now argued), nor that the basic industrial [1] tests were run on his models.

The board also held that Fenn's tests were not abandoned experiments (again relying heavily on the Sinko case) and that he had neither concealed nor suppressed his invention. The board concluded that Fenn conceived all of the counts on April 9, 1951, that counts 1, 2 and 3 were reduced to practice by him in April 1951, and that counts 1, 2 and 4 were reduced to practice in December 1951. The reductions to practice were found to be sufficiently demonstrated and properly corroborated.

The three features of count 1 which are in issue here are the shape of the ribbon, the closeness of its convolutions and its self-insulating property. Although appellant contests the conception by appellee of all of these features, he argues most vigorously that in order to meet the count the ribbon must be so tightly wound that all of its successive courses are in contact, that appellee's device does not qualify in this respect, nor was it ever intended to do so.

The question immediately arises whether the count requires that interpretation. We think it does not. It states that the successive courses of the spiral shall be *substantially in contact* and that they should be insulated at *their points of contact* solely by an oxide coating. It appears to us that the unambig-

---

1. The following appear to be the basic tests:

    1. Timing—the rate of heating of the element.

    2. Cherry-red factor—the length of time the element retains a red heat after removal from the energizing source.

    3. One minute burnout—whether the element remains operative after continuous heating for one minute.

    4. Life cycle test—whether the element survives 10,000 operating cycles.

uous meaning of the words does not necessitate the conclusion that a continuous contact of the faces of the ribbon each with the next is required to satisfy the count. Therefore, appellant's interpretation of the testimony which might show appellee's unawareness of that feature is not significant. It might be noted in this connection that appellant has been allowed a claim, in the appealed application wherein a tightly wound coil having the sides of the ribbon in "substantially face-to-face engagement" is a critical element.[2]

We now turn to the device that appellee conceived and its relation to the counts as a whole. Exhibit A dated April 9, 1951, which Fenn stated he sketched in pencil on that date, is a sheet of lined tablet paper showing various configurations of the formed ribbon including the V-shaped and arcuate forms and bearing notations of ".010 Kanthal"[3] and "lock coils by form to strengthen and stabilize [;] to compensate for thinner wire oxidize first by H. F or furnace then apply voltage." It is initialed by Fenn and Youhouse, the development engineer in charge of Casco's Research and Development Electrical Engineering Laboratory. Fenn explained that a conference with Youhouse was initiated on that day to tell him of his idea to meet the cigar lighter requirements of the automobile industry's projected 12-volt systems, and that he sketched Exhibit A so that Youhouse would have a visual image of the invention. Fenn kept this exhibit in his desk from then until this controversy arose.

Pursuant to Fenn's orders, Youhouse had several lighters (12 to 15) made incorporating Fenn's features in them. Within a few days after the conference with Youhouse, Fenn went to the laboratory and tested one of these lighters in several ways, including lighting a cigarette with it. Fenn stated:

" * * * I had been in the laboratory, even tested this [the heating element] myself, personally, and lighted cigarettes from it, to see if the tobacco would pull, and did many other things with it. * * * "

Later, one of these lighters, according to Youhouse, was taken to Fenn's office. Fenn testified that upon receiving it he placed it in his desk drawer where it remained until shortly before it was introduced in evidence as Exhibit B. Although Exhibit B may not be the lighter that Fenn tested himself, according to Youhouse it was, and there is no reason to believe it is not one made according to Fenn's specification. Youhouse's testimony in that respect is as follows:

"Q33. What, if anything was done with the sample after it was made? A. Well, we made up more than one sample, as I said. And I showed it to Mr. Fenn. And he came down to the lab and tried it out. He thought it was pretty good. He advised me to put one on the life test machine, and I did. However, within two days I got a phone call that he wanted to see that sample. That is the only one we had at the time.

"Q34. And what did you do then? A. I took it off the machine and brought it up to the office.

"Q35. What office? A. Mr. Fenn's office.

"Q36. What did you do with it then? A. I left it there. I never seen it after. In fact I thought it was lost, until I saw it afterwards, a little while ago. It never went back to the testing machine. I think it had a short cycling period of two days on the machine.

"Q37. I notice a white tag on Fenn's Exhibit B. Please examine that and indicate what it signifies to you. A. Well I had a girl type

---

2. In an interference involving that count, Fenn filed an abandonment of contest, and priority was awarded to Schnick.

3. A thinner wire than Casco had been using for the 6-volt lighter. Kanthal is wire containing aluminum which oxidizes when heated to produce an aluminum oxide coating which serves as an insulator.

up this tag, to put it on, to make sure that it is the right one, and initialled it, typed my initials on, to know what it is about, that that was the unit that I sent over. I didn't want to have it mixed with other heating units, so that we wouldn't be able to separate it afterwards.

"Q38. When did you have that tag typed? A. Before I took it up to the office.

"Q39. What date? A. I presume on that date. It must be on that date when I took it off. April 16, 1951."

A physical examination of that lighter shows that it meets the requirements of counts 1, 2 and 3, namely, the "ribbon is substantially V-shaped in cross section," and the "successive courses of said spiral * * * [are] substantially in contact each with the next whereby said annulus resists deformation in an axial direction." Youhouse's testimony convinces us that the wire used for the lighter was an aluminum alloy which was oxidized to form an aluminum oxide insulating coating. This satisfies the limitation, "said courses being insulated from each other at their points of contact solely by an insulating oxide."

■ The next question to be considered is whether the work done by Fenn and his subordinates amounted to an actual reduction to practice. As has been stated, Fenn had the lighters tested in various ways. He testified as follows:

"Q79. I would like to know what was done with this particular lighter, this particular sample that you mentioned. I would like to know what was done. A. Well, the questions that I was primarily interested in had to be tested to see what the results were. I would say the most important requirement was to see whether or not the coil would creep or distort under heat. The second major requirement was, since we were using a thinner cross-section wire, the cherry-red factor was a vital point. By that I mean the

requirement of a lighter is that it retain what we term cherry-red color, which is a heat, for a minimum of eight to ten seconds, since if it does not, it is not a satisfactory lighter, or would be known as a 'cold light', and would pull tobacco from the end of a cigarette.

"Now naturally, when you use a heavy cross-section, the mass is greater, and the heat is retained more easily. With a lighter, thinner gauge wire, it normally would cool much faster. To overcome this, the idea was to put more wire into the same diameter element retainer, wind the turns closely and retain the heat, in theory. And I was anxious to determine whether this would work out in practice.

"Q80. Did you determine it? A. Yes, I did.

"Q81. When did you determine it? A. I would say within a few weeks of the time I first put the sketch on paper and instructed him to proceed with this development. I visited the laboratory many times while the lighter was on test, and cycling. * * *"

■ Throughout the year 1951 several of them were given the usual laboratory tests which were accepted by the industry as basic for cigar lighters. Although a number of the test results did not meet the requirements of the Casco Company which would have warranted production of the lighter at that time, that was not fatal since we do not believe that an actual reduction to practice necessarily requires the making of a commercially acceptable embodiment, Van Cleef v. Tierney, 118 F.2d 911, 28 CCPA 1039; Radio Corporation of America v. International Standard Electric Corp., 3 Cir., 232 F.2d 726; see also Hildreth v. Mastoras, 257 U.S. 27, 42 S.Ct. 20, 66 L.Ed. 112; Tansel v. Higonnet, 215 F.2d 457, 42 CCPA 732; Field v. Knowles, 183 F. 2d 593, 37 CCPA 1211, if the testing of it shows that it will perform its intended function. The amount of testing necessary depends upon the facts of the par-

ticular case, Lustig v. Legat, 154 F.2d 680, 33 CCPA 991; Sinko Tool & Mfg. Co. v. Automatic Devices Corp., supra.

■ In this instance, since the 12-volt system required the use of longer and thinner wire, the main problems to be overcome were axial distortion and shorting. The self-insulated interlocked formed ribbon solved those problems, and there is sufficient evidence to convince us that the device made according to the specifications which Fenn prescribed satisfied Fenn that he had accomplished his purpose and that the device was satisfactory.

It must be remembered that Fenn and his associates were extremely experienced in this field and once they found the basic concept of the invention to be sound by testing it their principal concern was dissipated because they knew that the refinements necessary to perfect a commercially acceptable device could be made in the usual course of preparing it for mass production. Although a number of manufacturing techniques were tried and abandoned as not being practical, we know of no precedent which requires that proven methods of mass producing a device must exist before a reduction to practice is established. On the contrary, we believe the law to be that reduction to practice is proved when there is corroborated testimony that the device actually performed the function for which it was designed, Applegarth v. Wilson, 156 F.2d 373, 33 CCPA 1268; Sinko Tool & Mfg. Co. v. Automatic Devices Corp., supra, which we find to be the situation here.

Counts 1, 2 and 3 read upon Exhibit B and counts 1, 2 and 4 read on Exhibit C, this latter exhibit showing a ribbon having a substantially arcuate cross-section.

Youhouse in endeavoring to devise a low-cost method of manufacturing the formed wire coil, in late 1951 instructed one Beardsley, the model maker at Casco, to use the regular coil winding machinery and wind the coil into a conical spiral using a mandrel. Beardsley made about 25 coils by this method. An arcuate shape resulted because of the shape of the mandrel. In December 1951, Exhibit C was given the "life test," and thereafter was tagged and deposited in the archives of the Casco plant where it remained "until somebody wanted to see it work." Although the method of manufacture used to make it was found to be impractical, we are of the opinion that the exhibit represents one of the configurations sketched by Fenn on Exhibit A, that it was adequately identified and there was sufficient testing of it on the life test machine to establish a reduction to practice.

Appellant has argued that if Fenn possessed a workable 12-volt "formed" self-insulating wire lighter at the time he was discussing the Schnick-Cuno lighter with the Chrysler representative in the fall of 1952, he would have mentioned it. It is alleged that appellee's silence in that respect indicates that he did not consider his invention workable at that time. We do not agree with appellant.

Appellee visited the Chrysler Company to sell them the 12-volt flat wire lighter which Casco was then producing in competition with the Schnick-Cuno formed self-insulating wire lighter. It would have been extremely poor salesmanship if Fenn had admitted at that time that he felt the Cuno type lighter to be preferable, and that he had invented one which he was having difficulty convincing his company to produce. As we understand the evidence, Fenn visited Chrysler to sell the product which Casco could deliver, not to justify his position as an inventor at the expense of his company.

Appellant relies on Beals v. Finkenbiner, 12 App.D.C. 23, and cases such as Atlantic Works v. Brady, 107 U.S. 192, 203, 2 S.Ct. 225, 27 L.Ed. 438, to support the contention that Fenn's failure to mention that he was the inventor of the formed ribbon lighter when he was discussing 12-volt lighters with the Chrysler representative is a most significant factor in his favor. While it is a factor to be considered, the circumstances which rendered it important in

the cited cases are not present here. In Beals v. Finkenbiner an industry wide demand for a device to perform a certain function had arisen. Finkenbiner, the junior party to the interference, was a general manager of a company which supplied similar devices, and which in answer to the demand offered several which were unsatisfactory for the purpose during the period in which manufacturers were seeking a solution to their problem. During that same period he claims he conceived and reduced to practice a device which was acceptable, and which was not submitted by him either to the officers of his company or to the industry until after he saw that device in operation in one of the plants he supplied, at which time he asserted no claim to it.

In the case at bar Casco had an operable and satisfactory device which was acceptable to the automobile industry; there was no need in the industry which his firm was not capable of satisfying, clearly a situation different from that in the Beals v. Finkenbiner case.

In the Atlantic Works v. Brady case, [107 U.S. 192, 203, 2 S.Ct. 234] the "silent" inventor was shown to have long spoken of another's plan "as *the best possible plan that could be devised*, and that, although deeply interested in the success of the operations [with which the device was to be used], he never alluded to or hinted at any plan of his own devising different from it" (Emphasis ours), at a time when there was no device available which performed as satisfactorily as the invention he later laid claim to. This case is so obviously different from that at bar that it requires no further comment.

Appellant contends that even assuming Fenn conceived the invention in April 1951, the several unsatisfactory tests are convincing evidence that a reduction to practice was never accomplished and that those tests, together with the lack of further activity on Fenn's part, prove that he had but an abandoned experiment.

■ Since actual reductions to practice have already been established as of April and December 1951 by the activity of Fenn and his subordinates, the later tests conducted throughout 1951 and the early part of 1952 directed to the problems of devising a method for mass producing and in further perfecting the device are not significant in a determination of a reduction to practice. With respect to the issue of the device being an abandoned experiment, once reduction to practice has been found that question no longer exists. Brown v. Childs, 120 F.2d 350, 28 CCPA 1229. Therefore evidence of subsequent experimenting and testing is without probative value.

■ We come now to appellant's contention that Fenn concealed or suppressed his invention. In support of this position Schnick cites the fact that Fenn did not file his application until November 12, 1952, 19 months after Fenn conceived the invention and then only because he was stimulated by having procured one of appellant's lighters in September 1952. On innumerable occasions the courts have held that the length of time between reduction to practice and filing is not significant in and of itself, but that each case must be determined on its own set of facts. Brown v. Childs, supra; Wheeler v. Linton, 186 F.2d 738, 38 CCPA 799; Rhinevault v. Pfiester, 65 F.2d 161, 20 CCPA 1112.

■ Furthermore, the type of concealment which would estop an inventor from asserting his rights to an invention presupposes that the concealment was intentional. Rhinevault v. Pfiester, supra. The testimony here is devoid of any evidence which shows that characteristic to be present. Quite to the contrary, there are mitigating circumstances which convince us that Fenn cannot be chargeable with concealment or suppression.

Although in late 1951 and early 1952 large scale mass production of a 12-volt lighter for automobiles was not necessary since only a few were needed to satisfy the demand, it soon became apparent as more and more automobile companies

decided to convert to 12-volt systems, that the mass production of 12-volt lighters was required. When it became obvious that the automobile industry was in earnest about converting, it became imperative for Casco to mass produce a 12-volt lighter quickly in order to secure as much of this business as possible. Casco had already perfected 12-volt lighters having flat .014" resistance ribbons, some having ceramic cement between the convolutions and others not. The company decided to proceed with the production of those so that they would not be in a handicapped position, hence it produced 2 or 3 million of this type of lighter.

Fenn, the executive vice president of Casco, went to Detroit to endeavor to sell those lighters to the automobile companies and was successful in that endeavor. His company could not wait for the perfection of a technique to mass produce his invention in view of the highly competitive nature of the automobile accessory business.

Furthermore, even though Fenn was executive vice president of Casco and son-in-law of the president, he could not order the production of a new type of lighter which would require retooling operation in the plant especially when, during the period from December 1951 to September 1952, they were continuing "the development of the best design" and spending "a great deal of time discussing the feasibility of manufacturing an element of * * * [Fenn's] design for production." There is ample evidence that he endeavored to convince the various people in the hierarchy of his company to adopt his lighter. Ultimately though, it was Fenn's responsibility to manage the company so that its operation would run smoothly and profitably. Inventing was an extra-curricular activity of his.

This is not to say that Fenn was not concerned about filing an application for his invention during that period. In December 1951 he called his patent attorney and described to a patent agent in that office the fundamentals of his invention. That fact was corroborated by testimony and documentary evidence. At that time a preliminary search was made and Casco was billed for it. Undoubtedly there was a period between December 1951 and November 1952 when appellee could have filed his application, but Fenn could have been discouraged about the mass production of his lighter by the Engineering Department of Casco and the fact that the company was proceeding with the production of the 12-volt flat wire lighter.

We do not find sufficient evidence in this record to justify a conclusion that appellee concealed or suppressed his invention. Appellee might have been stimulated into action by the Cuno lighter which came into his possession, but it is more likely that he was motivated by the knowledge which he obtained in September 1952, i. e., that the entire automobile industry had definitely decided to convert to a 12-volt system. Whether it was either or both factors is not significant because evidence of wilful concealment or suppression is not present.

The record in this case is voluminous and we believe counsel for appellant in their brief have developed with great care every conceivable proposition which might support a judgment in appellant's favor. However, since we are of the opinion that appellee did conceive and reduce to practice a device upon which the counts read prior to the invention thereof by Schnick, and since we find neither concealment nor suppression of the invention by Fenn, appellee must prevail in this interference proceeding. Therefore, we *affirm* the decision of the Board of Patent Interferences.

Affirmed.