**Howard A. ELLIOTT, Appellant,**

v.

**Robert A. BARKER and John W. Shank, Appellees.**

**Patent Appeal No. 8912.**

United States Court of Customs and Patent Appeals.

Aug. 16, 1973.

**1338**

Sheldon W. Witcoff, Daniel M. Riess, Molinare, Allegretti, Newitt & Witcoff, Chicago, Ill., attorneys of record, for appellant.

Vincent L. Barker, Jr., Mark C. Schaffer, Carl F. Schaffer, Owen & Owen, Toledo, Ohio, attorneys of record, for appellees.

Before MARKEY, Chief Judge, RICH, BALDWIN, and LANE, Judges, and ALMOND, Senior Judge.

BALDWIN, Judge.

This appeal is from the decision of the Board of Patent Interferences awarding priority of invention to the appellees Barker and Shank (Barker). Appellant Elliott is involved through his patent No. 3,266,008, issued August 9, 1966 on an application filed January 13, 1964. Barker is involved through application serial No. 595,305, filed November 7, 1966 in which claim 2 of the Elliott patent, corresponding to the count, was copied. That application was copending with and accorded the benefit of the filing date of appellees' application serial No. 315,464, filed October 11, 1963.[1]

### The Invention

The invention relates to a terminal for an insulated electrical conductor such as is used as an ignition cable for an automobile. The structure will be apparent from the sole count which reads:

1. In combination,

an ignition cable having an outer sheath of electrical insulation material and an inner core of non-metallic fibrous strands coated with an electrically conductive carbonaceous material; said core having an end portion thereof extending beyond one end of said sheath and folded over said one end of said sheath;

said end portion of said core being impregnated with a conductive medium comprising a dispersion of carbon particles in a resinous base for binding the strands of said end portion of said core together, and

an electrical terminal having a ferrule portion of sheet metal extending around and tightly crimped onto said end of said sheath and the impregnated end portion of said core with said ferrule portion in electrically conductive engagement with said impregnated core.

### The Board's Decision

The board found that appellant's evidence, in the form of testimony of the inventor Elliott and an associate Lewis,[2]

---

1. Issued November 8, 1966, as patent No. 3,284,751.

2. Both technical employees of Elliott's assignee, by change of name, Essex International.

along with five documentary exhibits, did not prove actual reduction to practice by appellant prior to appellees' record date of October 11, 1963. It thus found it unnecessary to consider evidence of an earlier priority date submitted by appellees or a contention of appellees that appellant had abandoned, suppressed or concealed the invention under 35 U.S.C. § 102(g) even if he had reduced it to practice.

In effect, two dates were asserted by Elliott for actual reduction to practice. First, there is testimony of Elliott himself and Lewis that prior to September 6, 1956, Elliott made samples of ignition cables as defined by the count and gave them to Lewis who tested or supervised testing of them as indicated in a report designated Exhibit C. The board stated:

> 3. * * * This report is dated September 6, 1956 and includes the results of a resistance test (in ohms per inch) as well as results of "spark length" tests and "life" tests apparently made in the Electrical Laboratory. In addition to a group of samples made as defined in the count, a group of samples similarly prepared but omitting the step of applying a conductive resin and a third group defined as cables "cut and prepared in Wauseon using standard metal terminals with nail contacts" were also tested. It appears from the record that the present invention was intended as a replacement for the so-called nail type terminal construction.

> 4. The above shows that the resistances for the cable constructed according to the count were within the values identified in the report as "Ford Specification" values. The report also states, in respect to the "spark length" tests, that "These values showed that each group gave similar operating conditions." No values for the spark length are set out. As to the life test it is stated that the test was discontinued after 300 hours "with no sign of breakdown or deterioration apparent in any of the

samples." On page 3 of * * * [Exhibit C] it is stated:

> Samples for further study and submission to Ford are now being made up at Wauseon. Also several harnesses are being assembled and will be put on some private and company cars for service testing.

The evidence concerning the other date was discussed by the board as follows:

> Elliott further testified that sometime in 1963 "The Ford Motor Company came through with orders for sets" and identified EX–D as a document found in Simpkins' file after his death. Elliott testified that this document dated 6–6–63 refers to the types of devices about which he had just been testifying. Certain pages of EX–D include the caption "Customer Orders" and refer to the Ford Motor Company and another page appears to be a sketch and a description of an ignition cable.

Concerning the tests of September 9, 1956, the board found it significant that there was no evidence to establish the relationship between the conditions of the tests actually carried out and the intended functional setting of the invention, especially in view of the fact that the report indicated that appellant and Essex considered further tests under service conditions necessary. It also held that, while the customer's orders of Exhibit D might be considered business records admissible under 28 U.S.C. § 1732, the sketch attached to them could not be so considered, leaving Elliott's testimony as to the kind of devices referred to uncorroborated. Further noting the long delay of seven years in filing appellant's application, the board held that appellant had proved no more than conception by September 6, 1956.

The board further stated:

> Since Elliott does not urge that he is entitled to prevail on the basis of a prior conception with reasonable diligence from just prior to the entry of Barker et al into the field until his filing date, we need not consider the question of diligence.

## OPINITON

██ We find no reversible error in the board's holding that appellant had not proved he was entitled to a date of invention prior to appellees' record date of October 11, 1963.

The record shows that the tests made by September 6, 1956, and reported in Exhibit C included resistivity tests and laboratory tests. The results of the former were indicated to be that the resistance of the conductors was within the limits established by the Ford Motor Company.[3] The latter apparently showed that conductors meeting the count limitation performed equally to prior art conductors under certain simulated conditions using an ignition coil, a distributor and a spark gap and also that no breakdown or deterioration was apparent in a 300 hour life test that was only broadly described. However, the only use for the cables revealed in the record is "as automobile ignition cables or the like."[4] The relationship between these tests and the only intended functional setting is not established nor is it shown that these tests were usual or deemed adequate in the art to establish the utility of ignition cables. The problem to which the invention is particularly directed appears to be making an improved terminal connection for a cable using coated non-metallic fibrous strands for the conductor. The tests reported on Exhibit C would not appear to provide significant proof of the mechanical and electrical utility of such a structure when subjected to the vibration and adverse weather conditions that would be expected in the only use indicated.[5] The statement in the exhibit regarding assembly of additional samples for use in private cars for service testing tends to substantiate the board's conclusion that the reported tests were inadequate to establish utility in the functional setting of the invention.

The only evidence that further tests took place is testimony of Elliott himself, who stated that sample cables were used in his car and that of Simpkins, Essex's chief engineer. However, that testimony is meager as to the results, and what is more important, is wholly uncorroborated. While Elliott made general statements about other samples being tested by Lewis and by Ford, that testimony is devoid of any significant indication of results and it too is uncorroborated.

██ As to Exhibit D relating to asserted sales to Ford in June of 1963, we disagree with the board concerning the sketch attached to the "customer's orders." It is not a report of scientific research or tests as found inadmissible in Alpert v. Slatin, 305 F.2d 891, 49 CCPA 1343 (1962) but instead purports to describe the items listed in the customer's orders, and it forms part of the record comprising those orders. But even if we consider the entire exhibit, there is no convincing evidence of actual reduction to practice. At most it shows that Ford *ordered* 25 assemblies of each of twelve different cable types. The exhibit provides no evidence that the order was filled, that Ford paid for it, or what the price was. Also the small quantity indicates the purchase might well have been for test purposes and no results of tests of them by Ford are provided. The only other evidence concerning the matter is meager testimony of Elliott that Exhibit C came from Simpkins' files after his death and that "we started to work" on patenting the structure "as a result of the Ford order," and this is uncorroborated. We do not find this evidence to prove reduction to practice as might be the case with a substantial order that was proved to have been delivered and paid for.

██ Two matters remain. First, appellant urges that appellee conceded he had actually reduced to practice by Sep-

---

3. Satisfactory performance without causing radio interference apparently required that the resistance be between certain minimum and maximum values.

4. Elliott patent No. 3,266,008, supra.

5. Lewis spoke of the need to test the conductors "as to their thermostability."

tember 9, 1956, and that appellee is therefore estopped to contest the question. However, appellee actually made only a qualified admission as part of an alternative argument and plainly did not actully make the concession appellant argued.

Appellant also relies on Schnick v. Fenn, 277 F.2d 935, 47 CCPA 1174 (1960), as showing that the board erred in holding his tests to be insufficient, but that case is readily distinguished on the facts. In *Schnick*, the "usual" tests "which were accepted by the industry as basic for cigar lighters," the product involved, were made. Thus those tests, unlike the tests here, proved reduction to practice, and subsequent work toward refining the product did not amount to evidence to the contrary.

The decision is affirmed.

Affirmed.